## Case No. 4,436.

EMERSON v. DAVIES et al.

[3 Story, 768; 4 West. Law J. 261; 8 Law Rep. 270; 13 Hunt, Mer. Mag. 558.][1]

Circuit Court, D. Massachusetts. May Term, 1845.

[1] [Reported by William W. Story, Esq. 13 Hunt, Mer. Mag. 558, and 8 Law Rep. 270, contain only partial reports.]

George T. Curtis and John Pickering, for plaintiff.

Ivers J. Austin and Samuel A. Foot, for defendants.

STORY, Circuit Justice. This cause has been argued with great ability, and with great fullness of the examination of the evidence. The merits of the case, however, seem to me to depend mainly, if not altogether, upon two points: First, whether the plaintiff's book contains any thing new and original, entitling him to a copy-right. Secondly, whether, if the plaintiff has a title by copy-right, the defendants have infringed that copy-right by the book published by them, or, as it is technically expressed, whether they have printed the work of the plaintiff.

Upon the first question, at least, upon the evidence in the case, there does not appear to me to be any reasonable ground of doubt. The book of the plaintiff is, in my judgment, new and original, in the sense in which those words are to be understood in cases of copyright. The question is not, whether the materials which are used are entirely new, and have never been used before; or even that they have never been used before for the same purpose. The true question is, whether the same plan, arrangement and combination of materials have been used before for the

same purpose or for any other purpose. If they have not, then the plaintiff is entitled to a copy-right, although he may have gathered hints for his plan and arrangement, or parts of his plan and arrangement, from existing and known sources. He may have borrowed much of his materials from others, but if they are combined in a different manner from what was in use before, and a fortiori, if his plan and arrangement are real improvements upon the existing modes, he is entitled to a copy-right in the book embodying such improvement. See Lewis v. Fullarton, 2 Beav. 6. It is true, that he does not thereby acquire the right to appropriate to himself the materials which were common to all persons before, so as to exclude those persons from a future use of such materials; but then they have no right to use such materials with his improvements superadded, whether they consist in plan, arrangement or illustrations, or combinations; for these are strictly his own. A man who constructs a new machine, is entitled to a patent therefor, if the combination and arrangements thereof are new and his own invention, although he uses old materials and old mechanical apparatus and powers in constructing such machine. He may use wheels, or levers, or screws, or toggle-joints, or cranks, or any other known modes of accomplishing given mechanical ends, if he combines them in a new manner, and thus produces a beneficial result. The steam-engine, the steam-boat, the cut-nail machine, the card machine, the grooving machine, are all but new combinations of old materials, old processes, and old mechanical powers and apparatus.

In truth, in literature, in science and in art, there are, and can be, few, if any, things, which, in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before. No man creates a new language for himself, at least if he be a wise man, in writing a book. He contents himself with the use of language already known and used and understood by others. No man writes exclusively from his own thoughts, unaided and uninstructed by the thoughts of others. The thoughts of every man are, more or less, a combination of what other men have thought and expressed, although they may be modified, exalted, or improved by his own genius or reflection. If no book could be the subject of copy-right which was not new and original in the elements of which it is composed, there could be no ground for any copy-right in modern times, and we should be obliged to ascend very high, even in antiquity, to find a work entitled to such eminence. Virgil borrowed much from Homer; Bacon drew from earlier as well as contemporary minds; Coke exhausted all the known learning of his profession; and even Shakespeare and Milton, so justly and proudly our boast as the brightest

originals would be found to have gathered much from the abundant stores of current knowledge and classical studies in their days. What is La Place's great work, but the combination of the processes and discoveries of the great mathematicians before his day, with his own extraordinary genius? What are all modern law books, but new combinations and arrangements of old materials, in which the skill and judgment of the author in the selection and exposition and accurate use of those materials, constitute the basis of his reputation, as well as of his copy-right? Blackstone's Commentaries and Kent's Commentaries are but splendid examples of the merit and value of such achievements.

In truth, every author of a book has a copy-right in the plan, arrangement and combination of his materials, and in his mode of illustrating his subject, if it be new and original in its substance. Sir John Leach, in Barfield v. Nicholson, 2 Sim. & S. 1, 6, recognised this doctrine in its fullest extent; and there stated, that a copy-right might well be taken where the composition is either new, or there is a new arrangement thereof. Nay, the right to a copy-right does much farther. A man has a right to a copy-right in a translation, upon which he has bestowed his time and labor. To be sure, another man has an equal right to translate the original work, and to publish his translation; but then it must be his own translation by his own skill and labor; and not the mere use and publication of the translation already made by another. Wyatt v. Barnard, 3 Ves. & B. 77. A man has a right to the copy-right of a map of a state or country, which he has surveyed or caused to be compiled from existing materials, at his own expense, or skill, or labor, or money. Another man may publish another map of the same state or country, by using the like means or materials, and the like skill, labor and expense. But then he has no right to publish a map taken substantially and designedly from the map of the other person, without any such exercise of skill, or labor, or expense. If he copies substantially from the map of the other, it is downright piracy; although it is plain that both maps must, the more accurate they are, approach nearer in design and execution to each other. Matthewson v. Stockdale, 12 Ves. 270; Wilkins v. Aikin, 17 Ves. 422. He, in short, who by his own skill, judgment and labor, writes a new work, and does not merely copy that of another, is entitled to a copy-right therein; if the variations are not merely formal and shadowy, from existing works. He, who constructs by a new plan, and arrangement, and combination of old materials, in a book designed for instruction, either of the young, or the old, has a title to a copy-right, which cannot be displaced by showing that some part of his plan, or arrangement or combination, has been used before.

The case of Gray v. Russell [Case No. 5,728] affords a strong illustration of the

doctrine, as that was a case confessedly of a mere improvement of an old work, Adams's Latin Grammar, a subject that had been discussed and treated in many hundred works, and in which little more could be done than to arrange the materials upon a new plan, or in a new combination, with additional illustrations and initial remarks. Yet the court held it clearly to be the subject of a copy-right; and from the doctrine therein stated I feel not the slightest inclination to depart. It was upon the like ground that an action has been held to lie for the recovery of damages for pirating the new corrections and additions to an old work, (the Itinerancy of England.) Upon that occasion, Lord Kenyon said: "The courts of justice have been long laboring under an error, if an author have no copy-right in any part of a book, unless he have an exclusive right to the whole book." See, also, Trusler v. Murray, and Tonson v. Walker, cited in 1 East, 360, 361, and notes. Another illustration may be found in the cases of histories and dictionaries, as stated by Lord Mansfield in Sayre v. Moore, Id. 361, note. "In the first, a man may give a relation of the same facts, and in the same order of time; in the latter, an interpretation is given of the identical same words. But he must not servilely copy the words of another on either subject. An author has as much right in his plan, and in his arrangements, and in the combination of his materials, as he has in his thoughts, sentiments, opinions, and in his modes of expressing them. The former as well as the latter may be more useful or less useful than those of another author; but that, although it may diminish or increase the relative values of their works in the market, is no ground to entitle either to appropriate to himself the labor or skill of the other, as embodied in his own work.

It is a great mistake to suppose, because all the materials of a work or some parts of its plan and arrangements and modes of illustration, may be found separately, or in a different form, or in a different arrangement, or in other distinct works, that therefore, if the plan or arrangement or combination of these materials in another work is new, or for the first time made, the author, or compiler, or framer of it, (call him which you please,) is not entitled to a copy-right. The reverse is the truth in law, and, as I think, in common sense also. It is not, for example, in the present case, of any importance that the illustrating of lessons in arithmetic by attaching unit marks representing the numbers, embraced in the example, may be formed by dots in Wallis's Opera Mathematica, p. 28; or in Colburn's Arithmetic in the form of upright linear marks, in a pamphlet detached from the main work. That is not what the plaintiff purports to found his copy-right upon. He does not claim the first use or invention of unit marks for the purpose above mentioned. The use of these is a part of

and included in his plan; but it is not the whole of his plan. What he does claim is, 1. The plan of the lessons in his book; 2. The execution of that plan in a certain arrangement of a set of tables in the form of lessons to illustrate those lessons; 3. The gradation of examples to precede each table in such manner as to form with the table a peculiar and symmetrical appearance of each page; 4. The illustration of his lessons by attaching to each example unit marks representing the numbers embraced in the example. It is, therefore, this method of illustration in the aggregate that he claims as his invention, each page constituting of itself a complete lesson; and he alleges that the defendants have adopted the same plan, arrangement, tables, gradation of examples and illustrations by unit marks, in the same page, in imitation of the plaintiff's book, and in infringement of his copy-right, and, in confirmation of this statement, he refers to divers pages of his own book in comparison with divers pages of the book of the defendants. Now, I say that it is wholly immaterial whether each of these particulars, the arrangement of the tables and forms of the lessons, the gradation of the examples to precede the tables, the illustration of the examples by unit marks, had each existed in a separate form in different and separate works before the plaintiff's work, if they had never been before united in one combination or in one work, or on one page in the manner in which the plaintiff has united and connected them. No person had a right to borrow the same plan, and arrangement, and illustrations, and servilely to copy them into any other work. The same materials were certainly open to be used by any other author, and he would be at liberty to use unit marks and gradations of examples and tables and illustrations of the lessons, and to place them in the same page. But he could not be at liberty to transcribe the very lessons and pages and examples and illustrations of the plaintiff, and thus to rob him of the fruits of his industry, his skill, and his expenditures of time and money.

I have dwelt the more upon this point, because it seems to me that some of the learned witnesses, whose evidence is in the case, have entirely misunderstood the law upon this subject; and some portions of the argument at the bar seem to me to have proceeded upon an equally inadmissible ground, that if none of the materials of the plaintiff's book were new, or invented by him, that new combinations or arrangements, or illustrations of the old materials would give a title to a copy-right. My judgment is far otherwise; and as far as the evidence in this case goes, it is clear to my mind, that the plaintiff has a good copy-right in his book; that taking his plan, arrangements, lessons, examples and illustrations, as a whole, they are not to be found combined in any former work. I must con-

fess, that it strikes me that the plaintiff's method is a real and substantial improvement upon all the works which had preceded his, and which have been relied on in the evidence; but whether to be better or worse is not a material inquiry in this case. If worse, his work will not be used by the community at large; if better, it is very likely to be so used. But either way, he is entitled to his copy-right, "valere quantum valere potest."

The second question is the real and important question in the cause; and certainly it is not without its difficulties. It falls within that class of cases, where the differences between different works are of such a nature, that one is somewhat at a loss to say, whether the differences are formal or substantial; whether they indicate a resort to the same common sources to compile and compose them, or one is (as it were) uno flatu borrowed from the other, without the employment of any research or skill, with the disguised but still apparent intention to appropriate to one what in truth belongs exclusively to the other, and with no other labor than that of mere transcription, with such omissions or additions as may serve merely to veil the piracy. It is like the case of patented inventions in art or machinery, where the resemblances or diversities between the known and the unknown, and between invention and imitation, are so various or complicated, or minute or shadowy, that it is exceedingly difficult to say what is new or not, or what has been pirated and what is substantially different. The approaches on either side may be almost infinitely varied, and the identity or diversity sometimes becomes almost evanescent. In many cases, the mere inspection of a work may at once betray the fact that it is borrowed from another author with merely formal or colorable omissions or alterations. In others, again, we cannot affirm that identity in the appearance or use of the materials is a sufficient and conclusive test of piracy, or that the one has been fraudulently or designedly borrowed from the other. Take the case for example (already referred to) of two maps of a city, a county or a country. We cannot predicate that the one is a piracy from the other, simply, because their external appearance is in nearly all respects the same, with or without some additions or alterations or omissions. Take the case of two engravings copied from the same picture, or two pictures of natural objects by different artists;—it would not be practicable, in many cases, from the mere inspection of them and their apparent identity, to say, that the one was a transcript of the other. It would be necessary to resort to auxiliary and supplementary evidence to establish the fact either way. And this leads me to remark, that the bill directly charges "that the said work of the defendant Davies is copied and pirated from that"

of the plaintiff, and is an infringement of his copy-right in the particulars set forth in the bill. These particulars we shall have occasion hereafter to consider. The defendant, Davies, in his answer, alleges from his own knowledge, and the other defendant Barnes alleges from information and belief, "That neither the said work composed by the defendant Davies, nor any part thereof, is copied, adopted or taken from the said book of the said complainant, or any part thereof." Now this part of the answer, being directly responsive to the charge made in the bill, is positive evidence of the fact for the defendants, unless it is overcome by the clear testimony of two witnesses, or of one witness and equivalent circumstances. In short, the true exposition of this rule in equity is, that where the answer is responsive to the charge in the bill, it is to be taken as true, unless its credibility is impeached in such a manner as renders it unsafe and improper to place confidence in it; and this may be by direct testimony, or by circumstantial evidence sufficient to overthrow its credibility.

It has been suggested at the bar, and it is a suggestion not without weight, that the answer of the defendants no where denies, that Davies had seen the plaintiff's book before his own was compiled and published. The omission of such denial would have been more stringent if the bill had contained any interrogatory pointed directly to the fact that Davies had seen it. Not containing any such interrogatory, the attention of the defendants may not have been drawn to the importance of such a denial, if it could be correctly made. Still, as the book of Emerson was published in 1829, and had a wide circulation, and that of Davies was not published until 1840, the natural inference certainly is, that, composing a book on the same subject, for the same professed object, the instruction of beginners in arithmetic, he should, considering his local position in New York, have examined all the existing works published and on sale in the neighboring states upon the same subject. I rather incline, therefore, to think, that, under all the circumstances, it must be taken as a fact by the court, that Davies, when he compiled his work, had seen and read that of Emerson. But then this circumstance does not necessarily displace the substance of the answer to the charge in the bill. It may be true, that Davies had seen and read Emerson's book, and yet that he may not have copied or adopted or taken any part of it from that of Emerson; but from common sources open to all authors and compilers. It should be added that the answer expressly alleges that the similarity of appearance between certain pages of the two books alleged in the bill, "if such similarity of appearance do exist, which the defendants deny, was purely accidental and was not intended, expected or desired by this de-

fendant, Davies." There is some evidence that the arrangement of the whole matter of one lesson on one and the same page was the act of the stereotyper, and was afterwards adopted by Davies. But the stereotyper did not change the arrangement by Davies of the matter of each lesson; and if that matter had been on different pages, and yet it had been a mere transcript from Emerson's book, it would have been a clear invasion of his copy-right. The question is not in what part of one or more pages the matter is found, but whether it is borrowed or pirated from the plaintiff, without any substantial alteration or difference. In truth, however, the placing each lesson in one and the same page, having been finally accepted and acted upon by Davies, binds him just as much as if he had originally authorized or directed it.

The case, therefore, comes back at last to the naked consideration, whether the book of Davies, in the parts complained of, has been copied substantially from that of Emerson, or not. It is not sufficient to show, that it may have been suggested by Emerson's, or that some parts and pages of it have resemblances, in method and details and illustrations, to Emerson's. It must be further shown, that the resemblances in those parts and pages are so close, so full, so uniform, so striking, as fairly to lead to the conclusion that the one is a substantial copy of the other, or mainly borrowed from it. In short, that there is substantial identity between them. A copy is one thing, an imitation or resemblance another. There are many imitations of Homer in the Aeneid; but no one would say that the one was a copy from the other. There may be a strong likeness without an identity; and as was aptly said by the learned counsel for the plaintiff in the close of his argument, "Facies non omnibus una, non diversa tamen, qualem debet esse sororum." The question is, therefore, in many cases, a very nice one, what degree of imitation constitutes an infringement of the copy-right in a particular work. It is very clear that any use of materials, whether they are figures or drawings, or other things which are well known and in common use, is not the subject of a copy-right, unless there be some new arrangement thereof. Still, even here, it may not always follow, that any person has a right to copy the figures, drawings, or other things, made by another, availing himself solely of his skill and industry, without any resort to such common source. A striking case to illustrate the first part of this proposition, is Barfield v. Nicholson, 2 Sim. & S. 1, 6. There, the question was whether a work called the "Practical Builder," was an infringement upon the "Architectural Dictionary," both works having been compiled by the same gentleman, Mr. Nicholson, and both being, plainly, on the same subject, the science of architecture and the art of building. On that occasion, Sir John Leach (the vice-chancellor) said: "The Architectural Dictionary, and The Practical Builder, are plainly both works upon the same subjects, namely, the science of architecture and the art of building. The question is, whether the latter work is a piracy upon any part of the former work, which the author of that work had a right to claim as his own property, in respect that it was his own composition. Composition is either in new matter or new arrangement. The arrangement in the two works is altogether different. In The Architectural Dictionary, the information is scattered through the whole work, under the head of each particular term of science or art, arranged in alphabetical order: in The Practical Builder, the information is conveyed in the connected form of a treatise. If there be piracy here, it must be piracy of the matter of The Architectural Dictionary. The general answer of the defendant is, that The Practical Builder was conceived and planned by him as a speculation on his own account, and that he employed various artists in the execution of this work, and, among others, Nicholson and his son; and especially in the plates; and that he paid for everything as original design; and that, if it be a piracy, he is himself imposed upon. The Practical Builder, as far as published, consists of forty-six plates; and the affidavits allege that thirteen of these plates contain one, two, three or four figures, which are imitations of figures contained in The Architectural Dictionary; and the particular figures are pointed out in the affidavits. The entire resemblance of these figures, though in some instances denied, is generally admitted; but it is said, this resemblance is no proof of imitation. The figures of geometry must necessarily resemble each other in all works; and, in a great degree, this applies to the figures of architecture or building, where they are descriptions of things in use, as, for instance, in one of the articles, 'Roofs.' Where two works describe the figures of roofs in use, they must necessarily produce resembling figures. And the defendant then proceeds to show, that the figures used in his plates, supplied by the Nicholsons, are not, in fact, piratical copies of the plaintiff's works. The defendant does not deny (what could not be denied) that if the Nicholsons, whom he employed, piratically copied these figures from the plaintiff's work, that he is bound by their acts, as the acts of his agents, and that piracy in the Nicholsons is piracy in him. As to those figures in which he admits resemblance, he says there is not one of them, which was not given to the public in some or many works prior to The Architectural Dictionary; that some of these prior works were the works of Nicholson himself, as the articles of architecture in Rees's Cyclopedia, and the same articles in Brewster's Encyclopedia, and The Carpenter's Guide,

published in 1792. And he says further, that not only were these figures extant prior to The Architectural Dictionary, but that the Nicholsons had not, in fact, recourse to The Architectural Dictionary for them, nor to any materials collected for The Architectural Dictionary. Upon reference to the prior publications, it is proved to be indisputably true, that there is not one of these figures which had not been given to the world prior to The Architectural Dictionary; and the matter not being new, the author of The Architectural Dictionary could acquire no property in these figures except by a new arrangement; but there is clearly no novelty in his arrangement. The figures of The Architectural Dictionary are introduced to illustrate the letter-press; and so are all figures in prior works, as well as in The Practical Builder. If therefore the figures furnished by Nicholson for The Practical Builder had in fact been copied from the Architectural Dictionary, this would have been no piracy, because the author of The Architectural Dictionary had no property in these figures. But the Nicholsons, both father and son, positively swear that these figures were not copied from The Architectural Dictionary, nor from any materials collected for The Architectural Dictionary. With respect to the letter-press, the affidavits filed by the plaintiff do not point out particular instances of invasion; but upon the motion, I was referred to the article 'Roofs,' which is nearly a verbatim copy of the same article in The Architectural Dictionary. The defendant's answer here is the same as to the figures. This article was published verbatim in the Encyclopedia prior to The Architectural Dictionary, and is not therefore the property of the plaintiff."

The other part of the proposition may be illustrated by the case, already stated, of maps and engravings borrowed from copy-right maps and engravings, without any resort to the originals, or to any common sources. Wilkins v. Aikin. 17 Ves. 422, 424, 425; Matthewson v. Stockdale, 12 Ves. 270; Longman v. Winchester, 16 Ves. 269. In Roworth v. Wilkes, 1 Camp. 94, which was among other things, an action for pirating certain prints in a work on fencing, it appeared in evidence that three of the engravings of the defendant represented figures in exactly the same attitudes as the plaintiff's, but disguised by a different costume. Lord Ellenborough on that occasion, said: "But it is still to be considered whether there be such a similitude and conformity between the prints, that the person who executed the one set must have the others as a model. In that case, he is a copyist of the main design. But if the similitude can be supposed to have arisen from accident, or necessarily from the nature of the subject, or from the artist having sketched designs merely from reading the letter-press of the plaintiff's work, the defendant is not answerable. It is remarkable, how-

ever, that he has given no evidence to explain the similitude, or to repel the presumption which that necessarily causes." And the verdict was for the plaintiff. Now, it is quite as remarkable that the defendant, Davies, has not, (as far as I recollect) given any evidence as to what sources he examined in the compilation of his own work; and this, coupled with the fact that he has offered no denial, or proof that he had not seen, or read the plaintiff's book before his own compilation was made, is certainly a circumstance of some significance. It is in the highest degree probable that he had seen and read some of the works on arithmetic, referred to by the witnesses, before his compilation was made, such as Colburn's Arithmetic, Leslie's Philosophy of Arithmetic, Adams's Arithmetic, Develey's Arithmetique d'Emile, for they are all to be found in the library at West Point, where he was a professor. But it is far from being certain, that he had ever seen Francoeur's Cours complet de Mathematique Pures, or Jonaune's Arithmetique Elementaire; and there is no pretence to say that he had seen or used Wallis's Arithmetic. But neither of these works embraces in itself the same plan, method, arrangement, tables and examples, in the same connection, or for the same purposes, or in the same progressive order of lessons, as the plaintiff's. Adams's Arithmetic is wholly different. Colburn's Arithmetic approaches the nearest to the plaintiff's in its use of unit marks. But it differs from the plaintiff's in this material respect; that in Colburn's the unit marks are in a separate pamphlet from the text, and need, of course, the aid of an instructor. In the plaintiff's they are united, and the child instructs himself.

Now, it is by no means clear, that the defendant, Davies, without consulting the plaintiff's work, was in fact l d to the same course of lessons, examples, and illustrations, and tables, which he has used in the first twenty pages of his work, on addition, and which bears so close a resemblance to the first eighteen pages of the plaintiff's work. And the question then comes to this, whether he has, in substance, copied these pages, in plan, method, arrangement, illustrations and tables, from the plaintiff's work, with merely colorable alterations and devices to disguise the copy, or whether the resemblances are merely accidental, and naturally or necessarily grew out of the objects and scheme of the defendant, Davies's work, without any use of the plaintiff's. If the defendant, Davies, had before him, at the time, the work of the plaintiff, and used it as a model for his own plan, arrangements, examples and tables, then I should say, following the doctrine of Lord Ellenborough, in Roworth v. Wilkes, that it was an infringement of the plaintiff's copyright, notwithstanding the alterations and disguises in the forms of the examples and unit marks. Lord Mansfield, in Sayre v. Moore, cited 1 East, 361, 362, note, said: "In

all these cases the question of fact to come to a jury, is, whether the alteration be colorable or not. There must be such a similitude as to make it probable and reasonable to suppose, that one is a transcript of the other, and nothing more than a transcript. So in the case of prints; no doubt different men may take engravings from the same picture. The same principle holds in regard to charts, that a man who has it in his intention to publish a chart, may take advantage of all prior publications. There is no monopoly in the subject here, any more than in the other instances. But upon a question of this nature the jury will decide, whether it be a servile imitation or not." Observe, his lordship does not say, a mere literal copy, but a servile imitation. In Trusler v. Murray, Id. 362, note, Lord Kenyon put the point in the same light, and said: "The main question here, was, whether, in substance, the one work is a copy and imitation of the other; for, undoubtedly, in a chronological work, (the case before the court was of that nature) the same facts must be related." The same doctrine was recognized by the court of king's bench, in Cary v. Longman, Id. 358; and it was fully acted on in Matthewson v. Stockdale, 12 Ves. 270, and Longman v. Winchester, 16 Ves. 269, and Wilkins v. Aikin, 17 Ves. 422, 424, 425, in the court of chancery. So that, I think, it may be laid down as the clear result of the authorities in cases of this nature, that the true test of piracy or not is to ascertain whether the defendant has, in fact, used the plan, arrangements, and illustrations of the plaintiff, as the model of his own book, with colorable alterations and variations only to disguise the use thereof; or whether his work is the result of his own labor, skill, and use of common materials and common sources of knowledge, open to all men, and the resemblances are either accidental or arising from the nature of the subject. In other words, whether the defendant's book is, quoad hoc, a servile or evasive imitation of the plaintiff's work, or a bona fide original compilation from other common or independent sources.

In respect to the Abacus, I throw it at once, out of the case. The controversy is not, here, in respect to a patent for a machine, embodying the Abacus, but in respect to the copy-right of a book, instructing by lessons in an entirely different form and method. The Abacus may have suggested means of instruction by signs; but it is not a book, and has not the same identical objects, uses and methods of instruction. In comparing the book of the plaintiff with that of the defendant, Davies, in the first eighteen to twenty pages, the tables appear to be identical. It is said, that there is nothing new in these tables. That they are well known, and were in common use, long before the plaintiff's work was published. Be it so. The question is, not whether such tables existed before; but whether the use and arrangement of them as a part of the plaintiff's work, is new, and has not been borrowed by the defendant from the plaintiff. In each book they stand at the bottom of the page or lesson, and are used for the same purpose, to fix in the memory what has been previously taught in the lesson which precedes it. Then again, the mode of illustration by progressive lessons, and visible unit marks, is the same in each, and is used for precisely the same purpose. Take, for example, pages 10 and 11 of Davies and compare them with pages 8 and 9, of Emerson's; each puts the question in the same form, and each suggests the answer by visible unit marks. The unit marks in Davies are, uniformly, a star; the unit marks in Emerson are various—trees, apples, horses, chairs, &c. But will it be contended, that, if in all other respects these twenty pages were identical, the substitution of a star for other figures, or of one figure for another, would have made these pages substantially different? I presume not. The change of costume of the fencing figures, in the case before Lord Ellenborough, was treated as a mere evasion.

The two principal differences between the book of the defendant, Davies, and that of the plaintiff, in the pages in "Addition," already referred to, seem to be, first, that Davies uniformly uses stars as unit marks, and the plaintiff a great variety of different figures, to illustrate the questions; and secondly, that Davies there omits all the different modes of illustrating the questions by putting cases which the plaintiff uniformly uses. Thus Davies puts the question, "One and two are how many?" merely, and then places a star under one, and two stars under two; whereas the plaintiff puts the case thus, "Tell me how many trees are one and two trees," placing the figure of a tree by itself, and then the figures of two trees together, and then comes the question in the abstract, "One and two are how many?" Davies, however, puts divers illustrative examples, see pages 20, 21, but they are placed in a subsequent page, and are not a part of the original lesson, nor put in juxtaposition. In each book, (as has been already remarked), tables exactly alike follow at the bottom of the page, to be committed to memory, as the result of the lesson. The resemblances in the title or section of "Subtraction" in Davies are not so striking. The questions there put, and the tables there given, are of a similar nature; but the stars are omitted. But it is principally in the title or section of "Addition" that the resemblances are so close and exact, as directly to raise the question whether the title or section of the one book was borrowed, with colorable alterations only, from the other. If it was then, quoad this title or section, the injunction ought to be granted, although the rest of the work of Davies may not infringe any part of that of the plain-

tiff; for, to amount to an infringement, it is not necessary that there should be a complete copy or imitation in use throughout; but only that there should be an important and valuable portion, which operates injuriously to the copy-right of the plaintiff. The cases of Wilkins v. Aikin, 17 Ves. 422, and Bramnell v. Halcomb, 3 Mylne & C. 737, 738, and Campbell v. Scott, 11 Sim. 31, fully establish this position. See, also, Mawman v. Tegg, 2 Russ. 385, 397–400. Nor is it any objection to the injunction, that if it goes to a part of a work, it may render the other part, which is original, wholly without value, or injuriously diminish its value. The answer to this suggestion, if made, is to be found in the language of Lord Eldon, in Id. 388, 390. His lordship there said: "As to the hard consequences which would follow from granting an injunction, when a very large proportion of the work is unquestionably original, I can only say, that, if the parts which have been copied cannot be separated from those which are original, without destroying the use and value of the original matter, he who has made an improper use of that which did not belong to him, must suffer the consequences of so doing. If a man mixes what belongs to him with what belongs to me, and the mixture be forbidden by the law, he must again separate them, and he must bear all the mischief and loss which the separation may occasion. If an individual chooses in any work to mix my literary matter with his own, he must be restrained from publishing the literary matter which belongs to me; and if the parts of the work cannot be separated, and if by that means the injunction, which restrained the publication of my literary matter, prevents also the publication of his own literary matter, he has only himself to blame."

It has been truly said, that the subject of both of these works is of such a nature that there must be close resemblances between them. But the real question on this point, is, not whether such resemblances exist, but whether these resemblances are purely accidental and undesigned, and unborrowed, because arising from common sources accessible to both the authors, and the use of materials open equally to both; whether, in fact, the defendant Davies used the plaintiff's work as his model, and imitated and copied that, and did not draw from such common sources or common materials. Then, again, it has been said that, to amount to piracy, the work must be a copy and not an imitation. That, as a general proposition, cannot be admitted. It is true the imitation may be very slight and shadowy. But on the other hand, it may be very close, and so close as to be a mere evasion of the copy-right, although not an exact and literal copy. And again, it is said that the plan of the work of the defendant Davies is different from that of the plaintiff's. The volume is but the commencement of a course of mathematics. It may be true, (but into this I do not inquire), that taking the entire volume, the other parts may not be executed upon the same plan as the plaintiff's. But, then, if it substantially includes the essential parts of the plaintiff's plan, of his arrangement, examples and tables, so as to supersede the work of the plaintiff, it is a violation of his copy-right. It is like the case of publishing the substance of an article of an author in an Encyclopedia; or the substance of a volume of poems of an author in a work purporting to contain extracts from his works and those of other authors. Yet in each of these cases the copy-right of the author is violated. The cases of Mawman v. Tegg, 2 Russ. 388, and Campbell v. Scott, 11 Sim. 31, abundantly establish this. The plaintiff's volume consists but of forty-eight pages; and if it turns out that twenty or more of them have been so closely imitated by the defendant, Davies, and that it superseded that of the plaintiff, it will be difficult to say that it is not an infringement of his copy-right.

I have bestowed a good deal of reflection upon this case; and, at last, I feel constrained to say, that I am unable to divest myself of the impression that, in point of fact, the defendant, Davies, had before him, when he composed his own work, the work of the plaintiff, and that he made it his model, and imitated it closely in his title or section of "Addition," and in a great measure, in that of "Subtraction" also. The coincidences in plan, arrangement, modes of illustration, and tables, appear to me to be too exact, and various, to have been wholly accidental and without resort to the plaintiff's work. Both of the works appear to me to be highly meritorious; which is the most useful and convenient in practice, it is no part of my duty to consider or decide. That properly belongs to another tribunal—the public. Nor do I mean to suggest that the defendants have not acted with entire good faith; although I cannot but think they have acted under a mistake of the law. I strongly incline to the opinion, although I admit the case is not free from all difficulty, that it is my duty to order an injunction as to all the book of the defendant, Davies, from the tenth to the nineteenth pages inclusive, and from the twenty-fifth to the thirty-fourth pages, inclusive.

My only doubt has been, whether, under all the circumstances of the case, I ought not to direct an issue to try the question of the violation of the copy-right, as was done in Bramnell v. Halcomb, 3 Mylne & C. 737. If such an issue were directed, I should order it to be tried by a jury at the bar of this court, in the following form and confined to that; the jury to find whether the defendant, Davies, in his book, entitled "First Lessons in Arithmetic," stated in the case, in the pages thereof from the tenth to the nineteenth pages inclusive, and from

the twenty-fifth to the thirty-fourth pages inclusive, and from the thirty-seventh to the forty-fourth pages inclusive, did use the work of the plaintiff entitled "The North American. Arithmetic, Part First," stated in the case, as a model, and copy or imitate the plan, arrangement, mode of illustration, and tables thereof, or whether the same pages of the work of the said Davies were prepared without knowledge or use of, or reference to the said work of the plaintiff, and the coincidences therein arose from the use of common sources of information and common materials, open to both, and were accidental and undesigned. If the defendants shall elect the trial of such an issue, I shall be willing to grant it upon the terms, that they pay the ordinary taxable costs of the suit to the plaintiff up to the present time, the expense of the printing of the record being divided between the plaintiff and the defendants; and the future costs to abide the result of the verdict and decree of the court. In case such an issue shall be elected, no other evidence is to be laid before the jury except that contained in the record and the works therein referred to—with this qualification and enlargement, that the defendants shall be at liberty to offer evidence (if they choose), to show what were, in point of fact, the original sources and works to which the defendant, Davies, resorted, or which he used in compiling his work; and the plaintiff shall also be at liberty to offer evidence (if he chooses), that the defendant, Davies, had before, or in compiling his work, seen, known, and used the plaintiff's work; and for this, and for no other purpose, the plaintiff shall be at liberty to require the defendant, Davies, to answer upon oath, such written interrogatories as to his having seen, known, or used the plaintiff's work before or in compiling his own work, as he shall be advised.

The defendants are to elect whether they will take an issue or not, on or before the first day of September.

A petition for a re-hearing was afterwards filed [Case No. 4,437], but while it was under argument, the matter was finally settled by a private agreement of the parties, the plaintiff admitting, that the infringement of the copy-right by the defendant was unintentional, and the petition was accordingly withdrawn.