# UNITED STATES CIRCUIT COURT.

AUGUSTIN DALY agt. HENRY D. PALMER and HENRY C. JARRATT.

THE SAME agt. WILLIAM B. FRELIGH and J. E. McDONOUGH.

The copyright act of 1831, confers upon the author and proprietor of a dramatic composition duly copyrighted, the sole right and liberty of printing, re-printing, publishing and vending such composition *in whole or in part*, for the term of 28 years from the time of recording the title of such composition in the manner directed by the act. The act of 1856 (11 *U. S. Stat. at Large*, 138), provides, that any copyright thereafter granted to the author and proprietor of a dramatic composition, shall be deemed to confer along with such right, the sole right to act, perform and represent the same on any stage or public place, during the whole period for which the copyright is obtained.

A composition under the act of 1856, is a written or literary work invented and set in order. A dramatic composition is such a work, in which the narrative is not related, but is represented by dialogue and action. When a dramatic composition is represented in dialogue and action, by persons who represent it as real by performing or going through with the various parts or characters assigned to them severally, the composition is acted, performed or represented; and if the representation is in public, it is a public representation.

A written work consisting wholly of directions set in order for conveying the ideas of the author, on a stage or public place, by means of characters who represent the narrative wholly by action, is as much a dramatic composition designed or suited for public representation, as if language or dialogue were used in it to convey some of the ideas.

The "Railroad Scene" in the plaintiff's play of "Under the Gaslight," is undoubtedly a dramatic composition. Those parts of it represented by motion or gesture, without language, are quite as much a dramatic composition as those parts of it which are represented by voice. This is true also of the railroad scene in Boucicault's play of "After Dark." But the two scenes are identical in substance, as written dramatic compositions in the particulars, in which the plaintiff alleges, that what he has invented and set in order in the scene, has been appropriated by Boucicault.

In consonance with the principles laid down by Lord LYNDHURST (*D'Almaine* agt. *Boosey*, 1 *Younge & Collyer's Exch. R.* 288), the plaintiff is as much entitled to protection in respect of a substantial and material original part of his "railroad scene," as he is in respect of the whole. All that is substantial and material in plaintiff's railroad scene has been appropriated by Boucicault; and the railroad scence in Boucicault's play, is undoubtedly, when acted on a public stage, an infringement of the copyright of the plaintiff in his play.

*U. S. Circuit Court, 2d Circuit Southern District of New York. In Equity.*

Daly agt. Palmer.

*December Term*, 1868.

THESE cases came before the United States circuit court, held in and for the second circuit and southern district of New York, on a motion by plaintiff for a provisional injunction retraining the defendants from performing the plaintiff's "railroad scene" in his play of "Under the Gaslight," in a drama called "After Dark." The application was made upon bill of complaint and affidavits, and was opposed upon affidavits; no answer being presented or filed. The facts sufficiently appear from the opinion.

THOMAS S. ALEXANDER, WILLIAM TRACY *and* JOSEPH F. DALY, *for plaintiff*.
WILLIAM D. BOOTH *and* T. W. CLARKE, *for defendants*.

BLATCHFORD, J. This is an application for a provisional injunction to restrain the defendants from the public performance and representation, and from the sale for dramatic representation of a scene called the "railroad scene" in a play called "After Dark." The plaintiff is by profession a dramatic author, his business being to compose, write and produce on the theatrical stage dramatic compositions, commonly called plays. The defendants are the managers of a public place of theatrical amusement, in the city of New York, called Niblo's garden. Before the 1st of August, 1867, the plaintiff composed and wrote a dramatic composition called "Under the Gaslight," and on that day he took the proper steps to secure to himself a copyright for the composition, under the provisions of the act of February 3d, 1831, (4 *U. S. Stat. at Large*, 436), by depositing before publication a printed copy of the title of the composition, as author and proprietor, in the clerk's office of the district court of the southern district of New York, where he resided at the time. The composition was afterwards printed and published, and within three months from its publication he caused a copy of it, as printed and published, to be delivered to said clerk.

He also gave information of copyright being secured by caus-
ing to be printed and inserted in the several copies published
the words prescribed by the fifth section of the act.

The act of 1831 confers upon the author and proprietor
of a dramatic composition, duly copyrighted, the sole right
and liberty of printing, re-printing, publishing and vending
such composition, in whole or in part, for the term of twen-
ty-eight years from the time of recording the title of such
composition, in the manner directed by the act.    The act
of August 18th, 1856 (11 *U. S. Stat. at Large*, 138), pro-
vides, that any copyright thereafter granted under the laws
of the United States "to the author or proprietor of any dra-
matic composition, designed or suited for public representa-
tion, shall be deemed and taken to confer upon the said
author or proprietor, his heirs and assigns, along with the
sole right to print and publish the said composition, the sole
right also to act, perform or represent the same, or cause it
to be acted, performed or represented, on any stage or pub-
lic place during the whole period for which the copyright is
obtained.    The bill alleges that the plaintiff's play was
designed and suited for public representation; that it was
represented for the first time on the 12th of August, 1867,
under his direction, and for his benefit, at the New York
theatre, a public place of theatrical amusement in New York,
and was thenceforward represented there for eight consecu-
tive weeks; that it met with great success, attracted crowds
of persons, and was pecuniarily profitable to the plaintiff to
a large amount; that the particular cause of such success
was what was commonly called, after such public perform-
ance, the "railroad scene" at the end of the third scene of
the fourth act, in which one of the characters is represented
as secured by another, and laid helpless upon the rails of a
railroad track in such manner, and with the presumed intent,
that the railroad train, momentarily expected, shall run him
down and kill him, and just at the moment when such a fate
seems inevitable, another of the characters contrives to reach

the intended victim, and to drag him from the track as the train rushes in and passes over the spot.

That this incident and scene was entirely novel and unlike any dramatic incident known to have been heretofore represented on any stage, or invented by any author, before the plaintiff so composed, produced and represented the same. That the playing of said composition and scene caused the same to become famous in all parts of the United States and Canada and in England. That the chief value of the composition and its popularity, depend upon said "railroad scene;" that it was repeatedly produced and represented by and for the advantage of the plaintiff in many cities and towns of the United States and Canada, to the profit of the plaintiff.

That before learning of the alleged wrongs mentioned in the bill attempted by the defendants, the plaintiff had made arrangements for representing the play dramatically at New York and in various places in the United States during the present winter and the approaching spring; that he accordingly commenced to represent the play at the New York theatre, in the city of New York, on the 4th of November, 1868; that soon after the production, representation and printing of the play in the United States, one Dion Boucicault, a dramatic author and actor and theatrical manager, a subject of Great Britain, residing in England, procured a copy of said play by some means, and without the knowledge or consent of the plaintiff, prepared therefrom a play, which he called "After Dark," in which play he introduced several of the scenes and incidents of the plaintiff's play, varying them slightly, but following in them the invention and plan of the plaintiff's play, in a manner which was intended to differ from it only slightly, so as colorably to be a different work, while substantially retaining the attractive features of the plaintiff's play, and which contained, with only colorable variations, the said "railroad scene" of the plaintiff's play, substituting for the surface railroad an under-

ground railroad, for the rescuer of the victim to be killed on the railroad a man for a woman, for the railroad station in which the rescuer was confined a cellar, and for the breaking down a door to escape and rescue the victim the breaking down a wall or the door in a wall; that the work of Boucicault is a palpable imitation of the plaintiff's said "railroad scene," and is plagiarized therefrom and put into the play called " After Dark," by Boucicault, for the purpose of obtaining the pecuniary benefit which might otherwise result to the plaintiff from the representation of his play ; that the play of " After Dark" was performed in England without the plaintiff's consent, to the great profit of Boucicault, and was indebted for ist success and profit to such imitation of said " railroad scene ;" that Boucicault has sent copies of his play containing such plagiarism of said " railroad scene" to the defendants in the United States, for sale and performance for his own profit, and several copies of it are in the defendants' possession ; that the defendants are intending, and have announced their purpose to perform such play called " After Dark" publicly on the stage, at Niblo's garden, in New York, on the 16th of November, 1868, and every night thereafter till further notice, without the consent of the plaintiff; that such play and the plagiarism of said " railroad scene" are being rehearsed at Niblo's garden, under the direction of the defendants, with a view to such public performance thereof, and that the defendant Palmer, acting for Boucicault, is about to sell copies of the play called " After Dark," with said plagiarized scene, to other persons in the United States, to be publicly represented.

The bill prays for an injunction to restrain the defendants from the public representation, and from the sale for dramatic representation of the said " railroad scene " in " After Dark." The defense to the application on the facts is confined to showing by affidavits, that the following matters were known prior to the taking out by the plaintiff of his copyright, namely, the representation on a stage of a train

of cars drawn by a locomotive engine on a railroad ; a like representation, wherein the train appeared to run over a man lying on the track ; and a like representation, wherein the train appeared to run over a man lying on the track, who had been thrown thereon in a helpless condition by another of the characters, in order that he might be run over and killed. A story called "Capt. Tom's Fright," in the *galaxy* for March 15th, 1867, is also adduced to affect the validity of the plaintiff's copyright.

There is no answer to the bill, nor is there any denial of the allegations that Boucicault procured a copy of the plaintiff's play, and prepared therefrom the "railroad scene" in the play of "After Dark," and intended that the latter should only be colorably different from the "railroad scene" in the plaintiff's play, by making the substitutions before mentioned, and that the "railroad scene" in the play of "After Dark" was plagiarized by Boucicault from the "railroad scene" in the plaintiff's play. In the plaintiff's play there is a surface railroad, with a railroad station and a signal station or store room. A signal man appears, and a woman named Laura. At the request of Laura, the signal man locks her in the shed. There are some axes in it. One Snorkey then appears. The signal man then goes off. One Byke then enters with a coil of rope in his hand, and throws it over Snorkey and tightens it around his arm, and coils it around his legs, and then lays him across the track and fastens him to the rails, and goes off, having by language given it to be understood that the intention is that Snorkey shall be run over by the train and killed. Laura, from a window in the shed, sees what is done. The steam whistle of the train is heard. She takes an axe and strikes the door. The whistle is heard again, with the rumble of the approaching train. She gives more blows on the door with the axe; it opens. She runs and unfastens Snorkey; the lights of the engine appear, and she moves Snorkey's head from the track as the train rushes past. This

incident occupies the whole of the third scene of the fourth act.

There is a good deal of conversation first between the signal man and Laura, and then between Snorkey and the signal man, and then between Byke and Snorkey, and then between Laura and Snorkey. There are stage directions for Laura to go into the shed; for the signal man to lock her in; for Snorkey to enter; for the signal man to go off; for Byke to enter with the coil of rope; for Byke to throw the coil over Snorkey, and tighten the rope around Snorkey's arm, and coil it around his legs; for Byke to lay Snorkey across the track, and fasten him to the rails; for Byke to go off; for the steam whistle to be heard; for blows at the door to be heard; for the steam whistle to be heard again, with the rumble of the train; for more blows on the door to be heard; for the door to open; for Laura to appear with the axe in her hand; for her to run and unfasten Snorkey; for the lights of the engine to be seen; for Laura to take Snorkey's head from the track, and for the train to rush past. These stage directions are separate and apart from the conversation; and are in italics, and in parenthesis, at the appropriate places in the progress of the scene. The substance and purport of the successive conversations in the scene are that Laura requests the signal man to lock her in the shed and he consents; that Snorkey requests the signal man to stop by signal the expected train and he refuses; that Byke gives Snorkey to understand that he is to be run over and killed by the train, and that Snorkey requests Laura to break down the door and release him. The idea is also conveyed by the language in the scene, that Byke is about to commit robbery and murder at Laura's house, and that Snorkey is trying to give information of the fact.

In the play of "After Dark" the "railroad scene" is in the third act. In the first scene of that act one Gordon Chumley is rendered insensible by drugs, and one Old Tom is thrown by force into a wine vault. In the second scene

of that act Old Tom is represented as in the vault. There is an orifice in the vault which opens upon the track of an underground railroad. The rumbling of cars is heard, and lights flash through the orifice. Old Tom, through a door into an adjoining vault, sees two of the characters carry Chumley and break a hole through a wall and pass the body of Chumley through the hole, as he supposes, for conceal-ment in a well or vault. Old Tom then finds an iron bar and resolves to attempt escape by enlarging the orifice in the wall opening on the railroad. Then follows scene third. The railroad is seen, with a circular orifice which ventilates the cellar in which Old Tom is. The body of Chumley is seen lying across the rails, and the arm of Old Tom and then his head is passed through the orifice.

For this much of the scene there are only stage directions without spoken words. The following is a *verbatim* copy of the rest of the scene, the parts in parenthesis being stage directions: "Old Tom—About four courses of bricks will leave me room to pass. What is that on the line ? There is some-thing surely there. (A distant telegraph alarm rings, the semaphore levers play, and the lamps revolve.) Great Heaven! 'tis Gordon. I see his pale, upturned face—he lives! Gordon! Gordon! I'm here! He does not answer me. (A whistle is heard and distant train passes.) Ah! murderers. I see their plan. They have dragged his insen-sible body to that place and left him there to be killed by a passing train. Demons! Wretches! (He works madly at the orifice. The bricks fall under his blows. The orifice increases. He tries to struggle through it.) Not yet. Not yet. (The alarm rings again. The levers in the front play. The red light burns and a white light is turned to L. H. Tun-nel. The wheels of an approaching train are heard.) Oh, Heaven! give me strength—down—down. One moment! (A large piece of wall falls in and Old Tom comes with it.) See, it comes, the monster comes. (A loud rumbling and crashing sound is heard. He tries to move Gordon, but see-

ing the locomotive close on him, ne flings himself on the body and clasping it in his arms, rolls over with it forward. A locomotive, followed by a train of carriages rushes over the place, and as it disappears, Old Tom frees himself from Chumley and gazes after the train. The play of "After Dark" has never been published by Boucicault, although printed by him for private use.

The first inquiry is, what is meant by the act of 1856 by a "dramatic composition," what is meant by the "public representation" of a dramatic composition, and what is meant by the right to "act, perform or represent" a dramatic composition, on "a stage or public place?" The act of 1856 confers on the author or proprietor of a copyrighted "dramatic composition, designed or suited for public representation," the sole right of acting, performing or representing the same on a stage or public place, in addition to the sole right to print and publish such composition. The latter right must be considered as being conferred by the act of 1831, for although that act only speaks of a copyright for a "book or books, map, chart, musical composition, print, cut or engraving," yet under the language of the act of 1856, a "dramatic composition, designed or suited for public representation," must be regarded as embraced within the act of 1831. A composition, in the sense in which that word is used in the act of 1855, is a written or literary work invented and set in order. A dramatic composition is such a work in which the narrative is not related, but is represented by dialogue and action. When a dramatic composition is represented in dialogue and action by persons who represent it as real, by performing or going through with the various parts or characters assigned to them severally, the composition is acted, performed or represented; and if the representation is in public, it is a public representation. To act, in the sense of the statute, is to represent as real, by countenance, voice or gesture, that which is not real. A character in a play who goes through with a series of events on the stage with-

out speaking—if such be his part in the play—is none the less an actor in it than one who in addition to motions and gestures, uses his voice. A pantomime is a species of theatrical entertainment in which the whole action is represented by gesticulation without the use of words.

A written work consisting wholly of directions set in order for conveying the ideas of the author on a stage or public place by means of characters who represent the narrative wholly by action, is as much a dramatic composition designed or suited for public representation as if language or dialogue were used in it to convey some of the ideas. The "railroad scene" in the plaintiff's play is undoubtedly a dramatic composition. Those parts of it represented by motion or gestture, without language, are quite as much a dramatic composition as those parts of it which are represented by voice. This is true also of the "railroad scene" in "After Dark." Indeed, on an analysis of the two scenes in the two plays, it is manifest that the most interesting and attractive dramatic effect in each is produced by what is done by movement and gesture entirely irrespective of anything that is spoken. The important dramatic effect in both plays is produced by the movements and gestures which are prescribed and set in order so as to be read, and which are contained within parenthesis. The spoken words in each are of but trifling consequence to the progress of the series of events represented and communicated to the intelligence of the spectator by those parts of the scene which are directed to be represented by movement and gesture.

The series of events so represented and communicated by movement and gesture alone to the intelligence of the spectator, according to the directions contained in parenthesies in the two plays in question here, embraces the confinement of A. in a receptacle from which there seems to be no feasible means of egress; a railroad track with the body of B. placed across it in such manner as to involve the apparently certain destruction of his life by a passing train; the

appearance of A. at an opening in the receptacle from which A. can see the body of B.: audible indications that the train is approaching; successful efforts by A., from within the receptacle, by means of an implement found within it, to obtain egress from it upon the track, and the moving of the body of B. by A. from the impending danger, a moment before the train rushes by. In both of the plays the idea is conveyed, that B. is placed intentionally on the track with the purpose of having him killed. Such idea is in the plaintiff's play conveyed by the joint medium of language uttered and of movements which are the result of prescribed directions, while in Boucicault's play it is conveyed solely by language uttered. The action, the narrative, the dramatic effect and impression, and the series of events in the two scenes are identical. Both are dramatic compositions designed or suited for public representation.

It is true that in one A. is a woman, and in the other A. is a man; that in one A. is confined in a surface railroad station shed, and in the other A. is confined in a cellar abutting on the track; that in one A. uses an axe, and in the other A. uses an iron bar; that in one A. breaks down a door, and in the other A. enlarges a circular hole; that in one B. is conscious and is fastened to the rails by a rope, and in the other B. is insensible and is not fastened; and that in one there is a good deal of dialogue during the scene, and in the other only a soliloquy by A. and no dialogue. But the two scenes are identical in substance as written dramatic compositions in the particulars in which the plaintiff alleges that what he has invented and set in order in the scene has been appropriated by Boucicault.

Nor is this a case of first impression. An arrangement of musical notes, forming a tune or air, is a musical composition, and the author who has invented it and set it in order and copyrighted it, is entitled to protection. The extent of that protection has been the subject of judicial interpretation. In the case of *D'Almaine* agt. *Boosey.* (1 *Young & Collyer's*

*Exch. R.* 288), the plaintiffs, proprietors of the copyright of
an opera of Auber's, and also of another copyright of the
overture of the same opera, and also of another copyright
of the airs of the same opera, filed a bill in equity to restrain
the defendant from infringing such copyright.   The defend-
ant had published several of the airs with some alterations,
in the shape of quadrilles and waltzes.   It was claimed on
the part of the defendant that his work was merely an adap-
tation of the original, and therefore, not a piracy.   But the
court (Lord Chief Baron LYNDHURST) held, that if the defend-
ant had published the original air, though with adaptations
and harmonies, or for different instruments, it was a piracy,
and that it was not like the case of an abridgement of a book
where the purpose of the abridgement was distinct from that
of the work from which it was taken.

   On this subject the court says:   " It is admitted that the
defendant has published portions of the opera containing the
melodious parts of it;   that he has also published entire airs;
and that in one of his waltzes he has introduced seventeen
bars in succession, containing the whole of the original air,
although he adds fifteen other bars which are not to be found in
it.   Now, it is said, that this is not a piracy—first, because
the whole of each air has not been taken; and, secondly,
because what the plaintiffs purchased was the entire opera,
and the opera consists not merely of certain airs and melo-
dies, but of the whole score.   But, in the first place, piracy
may be of part of an air, as well as of the whole; and in the
second place, admitting that the opera consists of the whole
score, yet if the plaintiffs were entitled to the whole, *a foitiori*,
they were entitled to publish the melodies which form a
part.   Again, it is said, that the present publication is adap-
ted for dancing only, and that one degree of art is needed
for the purpose of so adapting it, and that but a small part
of the merit belongs to the original composer.   That is a
nice question.   It is a nice question what shall be deemed
such a modification of an original work as shall absorb the

merit of the original in the new composition. No doubt such a modification may be allowed in some cases, as in that of an abridgement or a digest. Such publications are in their nature original. Their compiler intends to make of them a new use; not that which the author proposed to make. Digests are of great use to practical men, though not so, comparatively speaking, to students. The same may be said of an abridgement of any study; but it must be a *bona fide* abridgement, because if it contains many chapters of the original work, or such as made that work most saleable, the maker of the abridgement commits a piracy. Now, it will be said, that one author may treat the subject very differently from another who wrote before him. That observation is true in many cases. A man may write upon morals in a manner quite distinct from that of others who preceded him; but the subject of music is to be regarded upon very different principles. It is the air or melody which is the invention of the author, and which may, in such case, be the subject of piracy; and you commit a piracy if, by taking not a single bar but several, you incorporate in the new work that in which the whole meritorious part of the invention consists. * * Now, it appears to me, that if you take from the composition of an author all those bars consecutively, which form the entire air or melody, without any material alteration, it is a piracy; though, on the other hand, you might take them in a different order, or broken by the intersection of others, like words, in such a manner as should not be a piracy. It must depend on whether the air taken is substantially the same with the original. Now the most unlettered in music can distinguish one song from another, and the mere adaptation of the air, either by changing it to a dance or by transferring it from one instrument to another, does not, even to common apprehensions, alter the original subject. The ear tells you that it is the same. The original air requires the aid of genius for its construction, but a mere mechanic in music can make the adaptation or accompani-

ment. Substantially, the piracy is, where the appropriated music, though adapted to a different purpose from that of the original, may still be recognized by the ear. The adding variations makes no difference in the principle." An injunction was granted.

The views of Lord LYNDHURST in that case were cited and approved by Mr. Justice NELSON, in this court, in the case of *Jollie* agt. *Jaques* (1 *Blatchf. C. C. R.* 618, 625). They are eminently sound and just, and are applicable to the case of a dramatic composition designed for public representation. Such a composition when represented excites emotions and imparts impressions not merely through the medium of the ear as music does, but through the medium of the eye as well as the ear. Movement, gesture and facial expression, which address the eye only, are as much a part of the dramatic composition as is the spoken language, which addresses the ear only; and that part of the written composition which gives direction for the movement and gesture is as much a part of the composition and protected by the copyright, as is the language prescribed to be uttered by the characters. And this is entirely irrespective of the set of the stage, or of the machinery or mechanical appliances, or of what is called in the language of the stage, scenery, or the work of the scene painter.

Now, in consonance with the princples laid down by Lord LYNDHURST, the plaintiff is as much entitled to protection in respect of a substantial and material original part of his "railroad scene," as he is in respect of the whole. Under the act of 1856, construed in connection with the act of 1831, he is entitled to be protected against piracy in whole or in part, by representation as well as by printing, publishing and vending. Although the act of 1831, in regard to printing, publishing and vending, uses the words "in whole or in part," and the act of 1856, in regard to representing, does not use those words, yet the act of 1856, by referring, as it does, to the right conferred by the act of 1831 as the "sole right to

print and publish" the copyrighted composition, when such right is on the face of the act of 1831, the sole right to print and publish "in whole or in part," and by then conferring "the sole right also to act, perform or represent the same, or cause it to be acted, performed or represented on any stage or public place," must be held to confer the right to represent in whole or in part. All that is substantial and material in the plaintiff's "railroad scene," has been used by Boucicault, in the same order and sequence of events, and in a manner to convey the sensations and impressions to those who see it represented, as in the plaintiff's play. Boucicalt has indeed adopted the plaintiff's series of events to the story of his play, and in doing so has evinced skill and art, but the same use is made in both plays of the same series of events to excite, by representation, the same emotions in the same sequence. There is no new use, in the sense of the law, in Boucicault's play, of what is found in the plaintiff's "railroad scene." The "railroad scene" in Boucicault's play, contains everything which makes the "railroad scene" in the plaintiff's play attractive as a representation on the stage.

As, in the case of the musical composition, the air is the invention of the author, and a piracy is committed if that in which the whole meritorious part of the invention consists is incorporated in another work, without any material alteration in sequence of bars, so in the case of the dramatic composition, designed or suited for representation, the series of events directed in writing by the author in any particular scene is his invention, and a piracy is committed if that in which the whole merit of the scene consists is incorporated in another work, without any material alteration in the constituent parts of the series of events, or in the sequence of the events in the series. The adaptation of such series of events to different characters who use different language from the characters and language in the first play, is like the adaptation of the musical air to a different instrument, or the addition to it of variations or of an accompaniment. The

original subject of invention—that which required genius to construct it and set it in order—remains the same in the adaptation. A mere mechanic in dramatic composition can make such adaptation, and it is a piracy if the appropriated series of events when represented on the stage, although performed by new and different characters using different language, is recognized by the spectator through any of the senses to which the representation is addressed, as conveying substantially the same impressions to, and exciting the same emotions in, the mind, in the same sequence or order.

Tested by these principles, the " railroad scene " in Boucicault's play is undoubtedly, when acted, performed or represented on a stage or public place, an invasion and infringement of the copyright of the plaintiff in the "railroad scene" in his play. The substantial identity between the two scenes would naturally lead to the conclusion that the latter one had been adapted from the earlier one. The charge of actual plagiarism on the part of Boucicault made in the bill is not denied. It is hardly possible that the resemblances are accidental, and that the differences are not merely colorable, with a view to disguise the plagiarism.

The true test as to whether there is piracy or not is to ascertain whether there is a servile or evasive imitation of the plaintiff's work, or whether there is a *bona fide* original compilation made up from common materials and common sources, with resemblances which are merely accidental, or result from the nature of the subject. (*Emerson* agt. *Davies,* 3 *Story,* 768, 793.) Nothing that has been adduced on the part of the defendant's affects the validity of the plaintiff's copyright on the question of the originality and novelty of the " railroad scene" in his play. The sale of Boucicault's play to other persons, with a view to its public representation, makes the seller a participant in causing the play to be publicly represented. An injunction must therefore, issue restraining the defendants' from the public performance or representation, and from the sale for

public performance or representation of the "railroad scene" in the play of "After Dark," or of any scene in substance the same as the "railroad scene" in either of the two plays, as such scene is herein defined.