NGUYEN, Circuit Judge, dissenting:
The majority allows the Gayes to accomplish what no one has before: copyright a musical style. "Blurred Lines" and "Got to Give It Up" are not objectively similar. They differ in melody, harmony, and rhythm. Yet by refusing to compare the two works, the majority establishes a dangerous precedent that strikes a devastating blow to future musicians and composers everywhere.
While juries are entitled to rely on properly supported expert opinion in determining substantial similarity, experts must be able to articulate facts upon which their conclusions-and thus the jury's findings-logically rely. Here, the Gayes' expert, musicologist Judith Finell, cherry-picked brief snippets to opine that a "constellation" of individually unprotectable elements in both pieces of music made them substantially similar. That might be reasonable if the two constellations bore any resemblance. But Big and Little Dipper they are not. The only similarity between these "constellations" is that they're both compositions of stars.
I.
When a court, with the assistance of expert testimony, is able to determine substantial similarity (or lack thereof) under the extrinsic test, judgment must be given as a matter of law. See Benay v. Warner Bros. Entm't, Inc. , 607 F.3d 620, 624 (9th Cir. 2010). If, for example, the defendant copied verbatim most of the plaintiff's *1139 work, then the plaintiff is entitled to a finding of substantial similarity as a matter of law. See Calhoun v. Lillenas Publ'g , 298 F.3d 1228, 1232 (11th Cir. 2002) ("[E]ven a casual comparison of the two compositions compels the conclusion that the two compositions are practically identical."). Conversely, if the objective similarities between the two pieces are merely trivial, then a verdict for the plaintiff could not stand. See Peters v. West , 692 F.3d 629, 636 (7th Cir. 2012) (affirming dismissal of infringement suit where the two songs "share[d] only small cosmetic similarities"); Newton v. Diamond ("Newton II") , 388 F.3d 1189 (9th Cir. 2004) (affirming grant of summary judgment to defendants who appropriated a de minimis portion of the plaintiff's musical composition and used it throughout their own work).
The majority, like the district court, presents this case as a battle of the experts in which the jury simply credited one expert's factual assertions over another's. To the contrary, there were no material factual disputes at trial. Finell testified about certain similarities between the deposit copy of the "Got to Give It Up" lead sheet and "Blurred Lines." Pharrell Williams and Robin Thicke don't contest the existence of these similarities. Rather, they argue that these similarities are insufficient to support a finding of substantial similarity as a matter of law. The majority fails to engage with this argument.
Finell identified a few superficial similarities at the "cell" level by focusing on individual musical elements, such as rhythm or pitch, entirely out of context. Most of these "short ... pattern[s]" weren't themselves protectable by copyright, and Finell ignored both the other elements with which they appeared and their overall placement in each of the songs. Her analysis is the equivalent of finding substantial similarity between two pointillist paintings because both have a few flecks of similarly colored paint. A comparison of the deposit copy of "Got to Give it Up" and "Blurred Lines" under the extrinsic test leads to only one conclusion. Williams and Thicke were entitled to judgment as a matter of law.
II.
A.
The purpose of copyright law is to ensure a robust public domain of creative works. See Sony Corp. of Am. v. Universal City Studios, Inc. , 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). While the Constitution authorizes Congress to grant authors monopoly privileges on the commercial exploitation of their output, see U.S. Const. art. I, § 8, cl. 8, this "special reward" is primarily designed to motivate authors' creative activity and thereby "allow the public access to the products of their genius." Sony Corp. , 464 U.S. at 429, 104 S.Ct. 774. Accordingly, copyrights are limited in both time and scope. See U.S. Const. art. I, § 8, cl. 8 (providing copyright protection only "for limited Times"); Sony Corp. , 464 U.S. at 432, 104 S.Ct. 774 ("This protection has never accorded the copyright owner complete control over all possible uses of his work."); see also Berlin v. E.C. Publ'ns, Inc. , 329 F.2d 541, 544 (2d Cir. 1964) ("[C]ourts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry.").
An important limitation on copyright protection is that it covers only an author's expression-as opposed to the idea underlying that expression. See 17 U.S.C. § 102(a) ("Copyright protection subsists ... in original works of authorship fixed in any tangible medium of expression ... from which they can be perceived, *1140 reproduced, or otherwise communicated...."); id. § 102(b) ("In no case does copyright protection ... extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in [the author's original] work."). Copyright "encourages others to build freely upon the ideas and information conveyed by a work." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co. , 499 U.S. 340, 349-50, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (citing Harper & Row Publishers, Inc. v. Nation Enters. , 471 U.S. 539, 556-57, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) ).
The idea/expression dichotomy, as this principle is known, "strikes a definitional balance between the First Amendment and the Copyright Act." Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC , 803 F.3d 1032, 1037 (9th Cir. 2015) (quoting Harper & Row , 471 U.S. at 556, 105 S.Ct. 2218 ) (alteration in Harper & Row omitted). Because "some restriction on expression is the inherent and intended effect of every grant of copyright," Golan v. Holder , 565 U.S. 302, 327-28, 132 S.Ct. 873, 181 L.Ed.2d 835 (2012), the idea/expression dichotomy serves as one of copyright law's "built-in First Amendment accommodations." Eldred v. Ashcroft , 537 U.S. 186, 219, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (citing Harper & Row , 471 U.S., at 560, 105 S.Ct. 2218 ).
Such accommodations are necessary because "in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout." Campbell v. Acuff-Rose Music, Inc. , 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting Emerson v. Davies , 8 F.Cas. 615, 619 (C.C.D. Mass. 1845) (Story, J.) ). Every work of art "borrows, and must necessarily borrow, and use much which was well known and used before." Id. (quoting Emerson , 8 F.Cas. at 619 ); see 1 Melville D. Nimmer & David Nimmer, Nimmer on Copyright § 2.05[B] (rev. ed. 2017) ("In the field of popular songs, many, if not most, compositions bear some similarity to prior songs.").[1] But for the freedom to borrow others' ideas and express them in new ways, artists would simply cease producing new works-to society's great detriment.
B.
"Blurred Lines" clearly shares the same "groove" or musical genre as "Got to Give It Up," which everyone agrees is an unprotectable idea. See, e.g. , 2 William F. Patry, Patry on Copyright § 4:14 (2017) ("[T]here is no protection for a communal style...."). But what the majority overlooks is that two works in the same genre must share at least some protectable expression in order to run afoul of copyright law.
Not all expression is protectable. Originality, the "sine qua non of copyright," accommodates authors' need to build on the works of others by requiring copyrightable expression to be "independently created by the author" and have "at least some minimal degree of creativity." Feist , 499 U.S. at 345, 348, 111 S.Ct. 1282. If an *1141 author uses commonplace elements that are firmly rooted in the genre's tradition, the expression is unoriginal and thus uncopyrightable. See id. at 363, 111 S.Ct. 1282.
Even original expression can be so intimately associated with the underlying idea as to be unprotectable. Under the doctrine of scènes à faire, "expressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law." Satava v. Lowry , 323 F.3d 805, 810 (9th Cir. 2003) (citing See v. Durang , 711 F.2d 141, 143 (9th Cir. 1983) ). The doctrine of merger provides that "where an idea contained in an expression cannot be communicated in a wide variety of ways," the "idea and expression may merge ... [such] that even verbatim reproduction of a factual work may not constitute infringement." Allen v. Acad. Games League of Am., Inc. , 89 F.3d 614, 617 (9th Cir. 1996) ; see also Rice v. Fox Broad. Co. , 330 F.3d 1170, 1175 (9th Cir. 2003) ("[S]imilarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market." (quoting Apple Computer, Inc. v. Microsoft Corp. , 35 F.3d 1435, 1443 (9th Cir. 1994) ) ).
The majority begins its analysis by suggesting that the Gayes enjoy broad copyright protection because, as a category, "[m]usical compositions are not confined to a narrow range of expression." Maj. Op. at 1120. But the majority then contrasts this protected category as a whole with specific applications of other protected categories-the "page-shaped computer desktop icon" in Apple Computer (an audiovisual work) and the "glass-in-glass jellyfish sculpture" in Satava (a pictorial, graphic, and sculptural work)[2] -that were entitled only to thin copyright protection due to the limited number of ways in which they could be expressed. That's a false comparison. Under the majority's reasoning, the copyrights in the desktop icon and glass jellyfish should have been broad. Like musical compositions, both audiovisual works and pictorial, graphic, and sculptural works can be expressed in myriad ways.
More importantly, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." Feist , 499 U.S. at 348, 111 S.Ct. 1282. Application of the extrinsic test "requires breaking the [copyrighted and allegedly infringing] works down into their constituent elements, and comparing those elements for proof of copying as measured by substantial similarity." Swirsky v. Carey , 376 F.3d 841, 845 (9th Cir. 2004) (internal quotation marks omitted). "Because the requirement is one of substantial similarity to protected elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material...." Id. We then "apply the limiting doctrines, subtracting the unoriginal elements," to determine how "broad" or "thin" the remaining copyright is. Ets-Hokin v. Skyy Spirits, Inc. , 323 F.3d 763, 766 (9th Cir. 2003) (citing Apple Computer , 35 F.3d at 1442 ).
The majority doesn't explain what elements are protectable in "Got to Give It Up," which is surprising given that our review of this issue is de novo. See Mattel, Inc. v. MGA Entm't, Inc. , 616 F.3d 904, 914 (9th Cir. 2010). But by affirming the jury's verdict, the majority implicitly draws the line between protectable and unprotectable expression "so broadly that future authors, composers and artists will find a diminished store of ideas on which to build their works."
*1142 Oravec v. Sunny Isles Luxury Ventures, L.C. , 527 F.3d 1218, 1225 (11th Cir. 2008) (quoting Meade v. United States , 27 Fed.Cl. 367, 372 (Fed. Cl. 1992) ).
The issue here isn't whether Williams and Thicke copied "Got to Give It Up"-there's plenty of evidence they were attempting to evoke Marvin Gaye's style. Rather, the issue is whether they took too much.
Copying in and of itself "is not conclusive of infringement. Some copying is permitted." Newton II , 388 F.3d at 1193 (quoting West Publ'g Co. v. Edward Thompson Co. , 169 F. 833, 861 (E.D.N.Y. 1909) (Hand, J.) ). Copying will only have legal consequences if it "has been done to an unfair extent." Id. (quoting West Publ'g , 169 F. at 861 ). In determining liability for copyright infringement, the critical and ultimate inquiry is whether "the copying is substantial." Id.
Requiring similarities to be substantial is of heightened importance in cases involving musical compositions. Sound recordings have "unique performance elements" that must be "filter[ed] out ... from consideration." Newton II , 388 F.3d at 1194. Thus, the range of musical expression is necessarily more circumscribed when music is written down than when it is performed. "Given the limited number of musical notes (as opposed to words in a language), the combination of those notes and their phrasing, it is not surprising that a simple composition of a short length might well be susceptible to original creation by more than one composer." Calhoun , 298 F.3d at 1232 (footnote omitted).
III.
The Gayes don't contend that every aspect of "Blurred Lines" infringes "Got to Give It Up." Rather, they identify only a few features that are present in both works. These features, however, aren't individually protectable. And when considered in the works as a whole, these similarities aren't even perceptible, let alone substantial.
Musical compositions are expressed primarily through the building blocks of melody, harmony, and rhythm.[3] See Newton v. Diamond ("Newton I") , 204 F.Supp.2d 1244, 1249 (C.D. Cal. 2002) (citing 3 Nimmer & Nimmer, supra , § 2.05[D] ); Randel, supra , at 481 ("The whole of music is often informally divided into three domains: melody, harmony, and rhythm."); see generally Aaron Copland, What to Listen for in Music 33-77 (McGraw-Hill 1957). The deposit copy of "Got to Give it Up" employs these components through a melodic line, an introductory bass line, and chord indications, with the additional feature of lyrics.
The melodic line and the associated lyrics are notated throughout the deposit copy. The bass line is notated for only the first eight measures,[4] at the end of which the phrase "bass simile" indicates that the *1143 bass line should continue in a similar manner. As is typical of a lead sheet, the chords are not expressed with individual notes indicating pitch and duration. Rather, the chords are described by name (e.g. , "A7" for a chord containing the pitches A, C#, E, and G) at places in the song where the harmony changes.
A. Alleged Melodic Similarities
1. The "Signature" Phrase
Finell dubbed a 10-note melodic sequence in the deposit copy the "Signature Phrase." She argued that it corresponded to a 12-note sequence in "Blurred Lines," notwithstanding that "no two notes have the same pitch, rhythm and placement," as the district court correctly observed.
Finell identified four similar elements, none of which is protectable: (a) each phrase begins with repeated notes; (b) the phrases have three identical pitches in a row in the first measure and two in the second measure; (c) each phrase begins with the same rhythm; and (d) each phrase ends on a melisma (one word sung over multiple pitches).
a. Repeated Notes
The Signature Phrase begins in "Got to Give It Up" with a note repeated four times. In "Blurred Lines," it begins with a note repeated twice, followed by a different note, followed by the first note.[5] The use of repeating notes is obviously not original to "Got to Give It Up." Finell repeatedly used the song "Happy Birthday to You" and the opening to Beethoven's *1144 Fifth Symphony as musical examples. Each of these famous melodies from the nineteenth century begins with repeated notes. Therefore, the use of repeated notes is not protectable.
b. Pitch Similarity
Although the Signature Phrase starts on different pitches in each piece, Finell identified three consecutive ascending pitches that were the same in both pieces, and two consecutive descending pitches that were the same. She believed this similarity to be the most important.
In assessing the similarity of two pieces of music, it's important to keep in mind "the limited number of notes and chords available to composers and the resulting fact that common themes frequently reappear in various compositions, especially in popular music." Gaste v. Kaiserman , 863 F.2d 1061, 1068 (2d Cir. 1988) (citing Arnstein v. Edward B. Marks Music Corp. , 82 F.2d 275, 277 (2d Cir. 1936) ). Substantial similarity "must extend beyond themes that could have been derived from a common source or themes that are so trite as to be likely to reappear in many compositions." Id. at 1068-69 (citing Selle v. Gibb , 741 F.2d 896, 905 (7th Cir. 1984) ).
Three consecutive pitches is just the sort of common theme that will recur in many compositions.[6] We have not yet addressed whether three pitches are protectable as a matter of law. While "a single musical note would be too small a unit to attract copyright protection ..., an arrangement of a limited number of notes can garner copyright protection." Swirsky , 376 F.3d at 851. Thus, we held in Swirsky that a melody of seven notes is not unprotectable as a matter of law. Id. at 852.
In Newton II , we considered a three-note musical phrase that the defendants sampled (i.e. , copied exactly) from the sound recording of a copyrighted musical composition and used repeatedly throughout their work. Although we did not decide whether this six-second segment was original enough to be protected, we held that "no reasonable juror could find [it] to be a quantitatively or qualitatively significant portion of the [four-and-a-half-minute] composition as a whole." Newton II , 388 F.3d at 1195. The district court reached the originality issue. In a "scholarly opinion," it ruled that the three-note phrase-even in combination with the background musical elements-was insufficiently original to warrant copyright protection. Id. at 1190 ; see Newton I , 204 F.Supp.2d at 1253 ("Many courts have found that nearly identical or more substantial samples are not susceptible to copyright protection.").
The two- and three-note melodic snippets at issue here, taken in isolation from their harmonic context, are even less original than the three-note segment at issue in Newton . When played, each snippet lasts less than a second in a composition that lasts over four minutes. They are not individually protectable.
c. Rhythmic Similarity
The first measure of the Signature Phrase in both works begins with a rhythm of six eighth notes. A bare rhythmic pattern, particularly one so short and *1145 common, isn't protectable. See Batiste v. Najm , 28 F.Supp.3d 595, 616 (E.D. La. 2014)"[C]ourts have been consistent in finding rhythm to be unprotectable."); N. Music Corp. v. King Record Distrib. Co. , 105 F.Supp. 393, 400 (S.D.N.Y. 1952) ("[O]riginality of rhythm is a rarity, if not an impossibility."); see also Berlin , 329 F.2d at 545 ("[W]e doubt that even so eminent a composer as plaintiff Irving Berlin should be permitted to claim a property interest in iambic pentameter."). Here, the rhythmic pattern lasts approximately 1.5 seconds and consists of an eighth note repeated without any variation. Similar patterns are found in numerous other works. This element, devoid of its melodic and harmonic context, lacks any originality.
d. Melisma
The final syllable of the lyrics in each phrase spans multiple pitches-three in "Got to Give It Up" and two in "Blurred Lines." Melisma, however, is "a common musical technique" and, as such, unprotectable. McDonald v. West , 138 F.Supp.3d 448, 458 (S.D.N.Y. 2015). Use of melisma on the final syllable of a lyrical phrase is particularly "basic and commonplace." Id. (involving melisma on the final syllable of "We made it in America"). For example, any time one sings "Happy Birthday" to a person with a one-syllable name, the person's name is sung as a two-note melisma at the end of the phrase "Happy Birthday, dear ____."
e. The Signature Phrases as a Whole Are Not Substantially Similar
Even when each element is not individually protectable, "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element," Metcalf v. Bochco , 294 F.3d 1069, 1074 (9th Cir. 2002). Here, as Finell concedes, the Signature Phrase has "very few notes," lasting less than four seconds. Therefore, even assuming that the Signature Phrase as a whole is protectable, its protection is thin.
There is very little similarity between the two songs' Signature Phrases. Both melodies rise and fall. But they begin and end on different pitches. The highest, longest, most stressed pitch in each phrase is different-in "Blurred Lines," this pitch is consonant with the underlying harmony; in "Got to Give It Up," it is dissonant. One phrase has 10 notes; the other, 12. The five identical pitches in each of the phrases have different rhythmic placement within the measure and therefore receive different stress. And only two of these identical pitches have similar underlying harmonies.[7] The harmony changes halfway through the Signature Phrase in "Blurred Lines" but remains the same in "Got to Give It Up." The lyrics in each phrase are different. The Signature Phrase occurs in different places within each piece. In "Got to Give It Up," the Signature Phrase is the very first phrase sung. In "Blurred Lines," the Signature Phrase is not sung until 28 seconds later-after several lines of verse.
The various unprotected elements identified by Finell don't even coincide with one another in that short, four-second snippet. And her narrow focus on these elements ignored the different harmonies in each phrase. "To pull these elements out of a song individually, without also looking at them in combination, is to perform an *1146 incomplete and distorted musicological analysis." Swirsky , 376 F.3d at 848.[8]
Given the lack of similarities between the Signature Phrases, there is no basis to conclude that they are substantially similar. "The most that can be said is that the two segments bear some relation to one another within a finite world of melodies. Given the limited musical vocabulary available to composers, this is far from enough to support an inference of [infringement]." Johnson v. Gordon , 409 F.3d 12, 22 (1st Cir. 2005).
2. The "Hook" Phrase
Finell describes the Hook Phrase as the four melodic pitches in "Got to Give It Up" sung to the lyrics "keep on dancin'." She opined that "Blurred Lines" has similar Hook Phrases in two different places: one is the four pitches in the Signature Phrase sung to the lyrics "take a good girl"; the other is the five pitches sung to the lyrics "I hate these blurred lines."
There are basic conceptual problems with Finell's analysis. She describes the same four pitches in "Blurred Lines" as being similar to two unrelated phrases in "Got to Give It Up"-the Signature Phrase and the Hook Phrase. It is difficult to see how anything original in each of these two different phrases could be distilled into the same four-note phrase in "Blurred Lines."
In any event, the Hook Phrase in the deposit copy lacks sufficient originality to be protected. Its sequence of four pitches, lasting 2.5 seconds, is common. For example, Beyoncé, Jennifer Hudson, and Anika Noni Rose memorably sang it to the lyrics, "We're your dreamgirls." See Henry Krieger & Tom Eyen, Dreamgirls measures 25-26 (Universal-Geffin Music 1981).
*1147 Even if the Hook Phrase pitches were protectable, there is no substantial similarity between its expression in the two songs. See Arnstein v. Edward B. Marks Music Corp. , 82 F.2d 275, 277 (2d Cir. 1936) (Hand, J.) ("The first phrase of the infringing chorus consists of the same four notes as the first phrase of the copyrighted song; that particular sequence can be found in several earlier musical pieces and its spontaneous reproduction should be no cause for suspicion.").
At most, three of the four pitches are the same,[9] and the different pitch is sung to what Finell described as the "money words" on "the strongest beat." The phrase's rhythms and underlying harmonies are different. Moreover, the phrases are sung at different places in each song. In "Got to Give It Up," the Hook Phrase is sung at the end of part 1 in a fade out. In "Blurred Lines," it is sung as the chorus in the middle of the song.
3. Theme "X"
Theme X refers to another four-note melodic sequence. In the deposit copy, Theme X is sung to the lyrics "Fancy lady." In "Blurred Lines," it is first sung to the lyrics "If you can't hear." Like the Hook Phrase, Theme X is both unprotectable and objectively dissimilar in the two songs.
*1148 The pitches and rhythm of Theme X in the deposit copy are identical to those sung to "Happy Birthday" and numerous other songs. None of the Theme X pitches in the deposit copy are the same as in "Blurred Lines." To see any correspondence between the two four-note sequences, one would have to shift and invert the pitches, a feat of musical gymnastics well beyond the skill of most listeners. Where short and distinct musical phrases require such contortions just to show that they are musically related, there is no basis to find them substantially similar. See Johnson , 409 F.3d at 22 ; see also Arnstein , 82 F.2d at 277.
The harmonies accompanying Theme X also differ between "Got to Give It Up" and "Blurred Lines." Structurally, Theme X appears in completely different places in the two songs. In the deposit copy, it repeats several times in succession near the end of the piece. In "Blurred Lines," it is the very first line of verse near the beginning of the song and repeats periodically throughout the song.
B. Other Alleged Similarities
1. Keyboard Parts
Finell testified that the keyboard parts in "Got to Give It Up" (meaning the chords and their rhythms played over the bass line) had "many important similarities" to those in "Blurred Lines." However, there are no keyboard parts in the deposit copy. Finell explained that a lead sheet is essentially "musical shorthand for musicians," who "would understand how [the keyboard parts are] to be played." But because "[a] sound is protected by copyright law only when it is 'fixed in a tangible medium,' " Newton II , 388 F.3d at 1194 (quoting 17 U.S.C. § 102(a) ), the deposit copy's unwritten *1149 keyboard parts are not protected expression.
To the extent the chord indications sufficiently express the keyboard parts, there is no substantial similarity between the two works. "Blurred Lines" contains only two chords throughout the entire piece-an A chord and an E chord-that alternate every four measures. The deposit copy contains neither of these chords. The chords it does contain-A7, D7, E7, B7, Dm7, and Am7-change in a much more irregular pattern. For example, the first 16 measures have a sustained A7 harmony, and the next 8 measures change harmonies every measure.
2. Bass Line
Finell opined that the bass melodies in "Got to Give It Up" and "Blurred Lines" are similar. However, when comparing them, she showed the jury the version of the "Got to Give It Up" bass line that she had transcribed from the sound recording. Because several notes were different in the deposit copy, her testimony on this issue was of questionable value. See Newton II , 388 F.3d at 1196. It's also doubtful that the unexpressed portions of the baseline beyond the first eight measures of the deposit copy are sufficiently fixed in a tangible medium to warrant protection.
Even assuming the implied bass line in the deposit copy is sufficiently fixed, it's the type of expression that is so standard in the genre that it merges with the idea and is therefore unprotectable in and of itself. Cf. Shapiro, Bernstein & Co. v. Miracle Record Co. , 91 F.Supp. 473, 474 (N.D. Ill. 1950) (concluding that bass line was not copyrightable where it was "mechanical application of a simple harmonious chord"). Any thin protection that might lie in the "Got to Give It Up" bass line would not support a finding of substantial similarity between these two bass lines given their different notes, harmonies, and rhythms.
The only similarity between the bass lines is that they repeat the note A in most of the measures. However, in "Got to Give It Up" the note is syncopated so that it sounds before the downbeat in the second, third, and fourth measures, whereas in "Blurred Lines" the note is played on the downbeat. Moreover, the note A is the root of the chord in each song (A7 in "Got to Give It Up," A in "Blurred Lines"). As the expert for Williams and Thicke testified without contradiction, it is commonplace for the root of a chord to appear in a bass line because it establishes the chord.
3. Word Painting, Parlando, and Lyrics
Word painting and parlando are common devices.[10] As Finell acknowledged, *1150 word painting has "been used for many centuries," and parlando has been employed for "many years before ... rap was used as an art form." The deposit copy's use of these techniques in the abstract is not protectable expression, and there is no evidence that the specific applications of these techniques in the two pieces are similar. To say these two songs are substantially similar because they employ devices common to songwriting would be like saying two songs are substantially similar because they both have guitar solos in the middle even though the solos themselves bear no resemblance. Similarly, lyrical themes about liberation and sexual activity are not protectable in the abstract. See Edwards v. Raymond , 22 F.Supp.3d 293, 301 (S.D.N.Y. 2014) (citing Feist , 499 U.S. at 344-45, 111 S.Ct. 1282 ); see also Peters , 692 F.3d at 636.
C. Overall Lack of Similarity
Even considering all of these individually unprotectable elements together, see Metcalf , 294 F.3d at 1074, there is no evidentiary basis to conclude that the two works are substantially similar. See Guzman v. Hacienda Records & Recording Studio, Inc. , 808 F.3d 1031, 1040 (5th Cir. 2015) (finding no similarity where "the alleged compositional similarities running between the songs in their entirety, i.e. , their melodies, rhythmic patterns, lyrical themes, and instrumental accompaniment, were either common to the ... genre or common in other songs").
The two pieces have different structures. Finell acknowledged that "Got to Give It Up" lacks a chorus whereas "Blurred Lines" has a "pretty common structure for a popular song" in that it consists of a verse, pre-chorus, and chorus. The two songs' harmonies share no chords.
The discrete elements identified by Finell don't occur at the same time within the musical theme or phrase in each piece. And with the exception of parlando, the various themes and phrases she identified don't occur in corresponding places in each piece. Thus, whether considered micro- or macroscopically, "Got to Give It Up" and "Blurred Lines" are objectively dissimilar. Williams and Thicke are entitled to judgment as a matter of law.
IV.
The majority insists that the verdict is supported by the evidence but tellingly refuses to explain what that evidence is. Instead, it defends its decision by arguing that a contrary result is impossible due to Williams and Thicke's purported procedural missteps. Maj. Op. at 1133-38. While the procedural mechanism for granting relief is beside the point given the majority's holding, there's no such obstacle here.
I agree that we normally are not at liberty to review the district court's denial of summary judgment after a full trial on the merits. See Ortiz v. Jordan , 562 U.S. 180, 131 S.Ct. 884, 178 L.Ed.2d 703 (2011). This rule makes eminent sense. Once a trial has concluded, any issues relating to the merits of the parties' dispute "should be determined by the trial record, not the pleadings nor the summary judgment record." Id. at 184, 131 S.Ct. 884 (quoting 15 Alan Charles Wright et al., Federal Practice & Procedure § 3914.10 (2d ed. 1992 & Supp. 2010) ). However, there is little difference between reviewing a summary judgment ruling and a jury verdict other than the source of the factual record, see Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and here there are no material factual disputes. A completed trial does not prevent us from reviewing the denial of summary judgment "where the district court made an error of law that, if not made, would have required the district court to grant the motion."
*1151 Escriba v. Foster Poultry Farms, Inc. , 743 F.3d 1236, 1243 (9th Cir. 2014).[11]
The majority conveniently ducks any review of the evidence by mischaracterizing the facts as "hotly disputed," Maj. Op. at 1134, and accusing me of "act[ing] as judge, jury, and executioner," id. at 1134, by "weigh[ing] the experts' credibility, resolv[ing] factual conflicts, and set[ting] forth [my] own findings on the extrinsic test," id. at 1136. But my "musicological exegesis," id. at 1134, concerns evidence of extrinsic similarity that Finell presented at trial. No one disputes that the two works share certain melodic snippets and other compositional elements that Finell identified. The only dispute regarding these similarities is their legal import-are the elements protectable, and are the similarities substantial enough to support liability for infringement? See Mattel , 616 F.3d at 914 ("We review de novo the district court's determination as to the scope of copyright protection." (citing Ets-Hokin , 225 F.3d at 1073 ) ); Benay , 607 F.3d at 624 ("Substantial similarity is a fact-specific inquiry, but it ' "may often be decided as a matter of law." ' " (quoting Funky Films, Inc. v. Time Warner Entm't Co. , 462 F.3d 1072, 1076 (9th Cir. 2006) ) ).
By characterizing these questions as a factual dispute among experts, the majority lays bare its misconception about the purpose of expert testimony in music infringement cases. As with any expert witness, a musicologist can't opine on legal conclusions, including the ultimate question here-substantial similarity. See Nationwide Transp. Fin. v. Cass Info. Sys., Inc. , 523 F.3d 1051, 1058 (9th Cir. 2008) ; Michael Der Manuelian, Note, The Role of the Expert Witness in Music Copyright Infringement Cases , 57 Fordham L. Rev. 127, 138 (1988) ("[E]xpert analysis is not relevant to the determination of substantial similarity of expression of ideas."); see also Swirsky , 376 F.3d at 851 ("[A] musicologist is not an expert on what the term 'idea' means under the copyright laws."). Her role is to identify similarities between the two works, describe their nature, and explain whether they are "quantitatively or qualitatively significant in relation to the composition as a whole," Newton II , 388 F.3d at 1196. The value of such testimony is to assist jurors who are unfamiliar with *1152 musical notation in comparing two pieces of sheet music for extrinsic similarity in the same way that they would compare two textual works.
This result would never stand in copyright cases involving works in other media. We "frequently" conclude as a matter of law that two works of language or visual art fail the extrinsic test for substantial similarity. Benay , 607 F.3d at 624 (quoting Funky Films, 462 F.3d at 1077 ); see, e.g. , Briggs v. Sony Pictures Entm't, Inc. , 714 F. App'x 712 (9th Cir. 2018) (screenplays); Rentmeester v. Nike, Inc. , 883 F.3d 1111 (9th Cir. 2018) (photograph); Silas v. Home Box Office, Inc. , 713 F. App'x 626 (9th Cir. 2018) (television show); Folkens v. Wyland Worldwide, LLC , 882 F.3d 768 (9th Cir. 2018) (drawing); Mintz v. Subaru of Am., Inc. , 716 F. App'x 618 (9th Cir. 2017) (advertising image and phrase); Edwards v. Cinelou Films , 696 F. App'x 270 (9th Cir. 2017) (film); Heusey v. Emmerich , 692 F. App'x 928 (9th Cir. 2017) (screenplay and film); Braddock v. Jolie , 691 F. App'x 318 (9th Cir. 2017) (novel and film); Basile v. Twentieth Century Fox Film Corp. , 678 F. App'x 576 (9th Cir. 2017) (stories and film); Antonick v. Elec. Arts, Inc. , 841 F.3d 1062 (9th Cir. 2016) (video game), cert. denied , --- U.S. ----, 138 S.Ct. 422, 199 L.Ed.2d 323 (2017) ; see also Mattel , 616 F.3d at 917-18 (vacating jury determination of substantial similarity between dolls).[12] This case should be no different.
V.
The Gayes, no doubt, are pleased by this outcome. They shouldn't be. They own copyrights in many musical works, each of which (including "Got to Give It Up") now potentially infringes the copyright of any famous song that preceded it.[13]
That is the consequence of the majority's uncritical deference to music experts.
Admittedly, it can be very challenging for judges untrained in music to parse two pieces of sheet music for extrinsic similarity. But however difficult this exercise, we cannot simply defer to the conclusions of experts about the ultimate finding of substantial similarity.[14] While experts are invaluable in identifying and explaining elements that appear in both works, judges must still decide whether, as a matter of law, these elements collectively support a finding of substantial similarity. Here, they don't, and the verdict should be vacated.
I respectfully dissent.

As an example, Williams and Thicke attempted to show the jury a video demonstrating how a common sequence of four chords serves as the harmonic backbone of innumerable songs. See Axis of Awesome, 4 Chord Song (with song titles) , YouTube (Dec. 10, 2009) https://www.youtube.com/watch?v=5pidokakU4I (singing 38 popular songs over the same chord progression, ranging from "Let It Be" by the Beatles to "If I Were a Boy" by Beyoncé). "Blurred Lines" employs only two chords-the first two from this sequence. The district court prevented the jury from hearing this evidence. However, the court allowed the jury to hear mashups of "Blurred Lines" played together with "Got to Give It Up," which the Gayes used to show that the two songs were harmonically similar.

The Copyright Act expressly protects each of these categories. See 17 U.S.C. § 102(a)(2) (musical works); id. § 102(a)(5) (pictorial, graphic, and sculptural works); id. § 102(a)(6) (motion pictures and other audiovisual works).

Of course, these aren't the only elements through which a musical idea can be expressed in tangible form. See Swirsky , 376 F.3d at 848-49. Other elements include tempo (the speed at which a composition is played), dynamics (the volume of sound), and instrumentation. See id. Many elements can be broken down into constituent elements. For example, melody is a sequence of pitches played successively; harmony is a group of pitches played simultaneously; and a chord progression is a sequence of harmonies. See Don Michael Randel, The New Harvard Dictionary of Music 366, 481-82 (1986). The analysis will generally focus on the most relevant subset of elements, which depends on the nature of the music at issue. See Swirsky , 376 F.3d at 849. Finell did not compare the songs' overall harmonies because she felt "that wasn't the most important similarity."

In musical notation, the notes signifying individual pitches are grouped into "measures" divided by vertical "bar" lines. Within a measure, the note immediately after the bar line, or "downbeat," receives the greatest emphasis.

Finell attempted to minimize the significance of the third note in "Blurred Lines" moving to a neighboring pitch rather than repeating. However, she previously testified that the neighboring pitch-a sharp second scale degree (indicated "#2" in her exhibit)-was a "broken rule" that "stands out." Thus, the most prominent note in the four-note sequence in "Blurred Lines" is the one that differs from the corresponding sequence in "Got to Give It Up."

There are only 12[3] or 1,728 unique combinations of three notes, and many of them are unlikely to be used in a song. See Darrell v. Joe Morris Music Co. , 113 F.2d 80, 80 (2d Cir. 1940) (per curiam) ("[W]hile there are an enormous number of possible permutations of the musical notes of the scale, only a few are pleasing; and much fewer still suit the infantile demands of the popular ear."). Finell testified that it's "unusual" to use the five notes that fall between the seven notes of the scale. Demand for unique three-note combinations would quickly exhaust their supply. In 2016 alone, the Copyright Office registered over 40,000 sound recordings. See United States Copyright Office, Fiscal 2016 Annual Report 17.

In "Got to Give It Up," the entire Signature Phrase is harmonized to an A7 chord. In "Blurred Lines," the first measure is harmonized to an E chord while the second measure is harmonized to an A chord. Seventh chords, such as A7, have the same three pitches as their underlying triads-here, an A chord-plus an additional pitch. See Copland, supra , at 66-67. Finell explained that the unique pitch in a seventh chord "add[s] an extra color" to the harmony.

The majority fundamentally misunderstands Swirsky on this point. See Maj. Op. at 1136-37. Swirsky did not hold that two works sharing multiple unprotected elements in disparate places are extrinsically similar. Were that the case, the entire Western canon would be extrinsically similar, since all of this music contains the same twelve individually unprotected notes. The difference between Swirsky and this case is that in Swirsky , there was a coincidence of the unprotected elements (chord progressions, rhythm, and pitch sequence) within each song that occurred at the same relative place (the chorus) in both. See Swirsky , 376 F.3d at 848. Here, Finell examined the various elements in isolation, which is precisely what we criticized in Swirsky . See 376 F.3d at 848 ("[N]o approach can completely divorce pitch sequence and rhythm from harmonic chord progression, tempo, and key....").

Finell cited two examples of the Hook Phrase in "Blurred Lines," but they share only the last two pitches of their four- and five-note sequences. These two shared pitches are both tonic notes, which Finell described as "very common" in melodies.

Word painting is a compositional technique in which the music can be used to illustrate the words in the lyrics, such as setting the word "higher" to an ascending melody. Parlando is spoken word or rap in the middle of a song.

The majority surprisingly questions whether Escriba "survives" Ortiz . Maj. Op. at 1121-22. Since Ortiz expressly declined to decide whether there is an exception to the general rule for " 'purely legal' issues capable of resolution 'with reference only to undisputed facts,' " 562 U.S. at 189, 131 S.Ct. 884, it didn't undermine our case law. Regardless, the majority isn't free to revisit circuit precedent absent intervening higher authority that is "clearly irreconcilable" with it. Miller v. Gammie , 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc). Even if the majority were correct that this is a factual matter and Williams and Thicke's lack of a Rule 50(a) motion forfeited their right to challenge the evidentiary sufficiency-notwithstanding the district court's statement that it would not grant Rule 50(a) motions "by either side," but see Tortu v. Las Vegas Metro. Police Dep't , 556 F.3d 1075, 1083 (9th Cir. 2009) (leaving open possibility that Rule 50(b) motion is not forfeited where district court instructs parties not to file Rule 50(a) motion); Thompson & Wallace of Memphis, Inc. v. Falconwood Corp. , 100 F.3d 429, 435 (5th Cir. 1996) (citing district court's instruction "not to make the rule 50(a) motion" as "legitimate excuse" for not making one)-we can still review the sufficiency of the evidence for plain error. See Nitco Holding Corp. v. Boujikian , 491 F.3d 1086, 1089 (9th Cir. 2007) (citing Patel v. Penman , 103 F.3d 868, 878 (9th Cir. 1996) ) (contrasting Rule 50(b) motion as "absolute prerequisite" for appellate relief). A decision permitting entire genres of music to be held hostage to infringement suits is a "manifest miscarriage of justice," Patel , 103 F.3d at 878, warranting relief.

In faulting my citation of unpublished cases, see Maj. Op. at 1135-36, the majority misses the point. That we choose not to publish many of our numerous cases deciding substantial similarity as a matter of law shows only how uncontroversial these decisions are when they concern non-musical works.

"Happy Birthday to You" was still copyright protected when Marvin Gaye wrote Theme X. See Eldred , 537 U.S. at 262, 123 S.Ct. 769 (2003) (Breyer, J., dissenting).

Federal Rule of Evidence 706, which allows courts to appoint their own experts, may be useful in situations where the court has little musical expertise and the parties' experts deliver starkly different assessments of two works' similarity.